UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLAYTON PIERCE,

        Plaintiff,

                                    Civil Case No. 14-14491
v.                                Honorable Linda V. Parker

GENERAL MOTORS LLC, GENE
LAUER, GREG PEPIN, DAVID NEIL,
TODD AICHER, and TRENT MILLER,

        Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On November 24, 2014, Plaintiff filed this lawsuit against Defendant

General Motors LLC ("GM") and the following GM employees: Gene Lauer, Greg

Pepin, David Neil, Todd Aicher, and Trent Miller (collectively "Defendants"). In

a Second Amended Complaint filed March 23, 2015, Plaintiff asserts the following

claims against Defendants:

- religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts I and V);

- failure to accommodate Plaintiff's religious beliefs in violation of Title VII (Counts II and VI);

- race discrimination and retaliation in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") (Counts III, IV, and VII);

- hostile work environment in violation of Title VII and ELCRA (Counts VIII and IX);

- failure to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act ("ADA") (Count X); and

- intentional infliction of emotional distress (Count XI).[1]

(ECF No. 4.)  Presently before the Court is Defendants' motion for summary judgment with respect to Plaintiff's claims, filed pursuant to Federal Rule of Civil Procedure 56 on December 18, 2015.  The motion has been fully briefed and the Court held a motion hearing on August 23, 2016.  For the reasons that follow, the Court grants Defendants' motion.

## I.    Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1] Plaintiff includes an additional count labeled "punitive damages" in his Second Amended Complaint.  (ECF No. 4 ¶¶ 130-131.)  Punitive damages are a remedy, however, not a separate cause of action.  *See, e.g., Price v. Agrilogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014); *Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1086 (S.D. Ohio 2013); *Trakhtenberg v. Oakland Cnty.*, No. 14-13854, 2015 WL 6449327, at *19 (E.D. Mich. Oct. 26, 2015).

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  A complaint that is neither verified by the plaintiff, sworn to, nor made under penalty of perjury does not constitute evidence the court can

3

consider on summary judgment. *Turney v. Catholic Health Initiatives*, 35 F. App'x 166, 168 (6th Cir. 2002) (finding that because the plaintiff did not verify her amended complaint or state that her allegations were made under penalty of perjury, it was not sufficient to defeat the defendants' motion for summary judgment); *cf. El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (indicating that a "verified complaint ... carries the same weight as would an affidavit for the purposes of summary judgment ... to the extent that it is based on personal knowledge."); *see also* 28 U.S.C. § 1746.

The district court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the … party relies[.]" *InterRoyal Corp.*, 889

F.2d at 111.  This is expressly stated in this Court's practice guidelines.  *See*

Motion Practice Rule G1 at

http://www.mied.uscourts.gov/index.cfm?pageFunction=chambers&judgeid=46.

## II.     Factual and Procedural Background[2]

Plaintiff, who is African American, began working for GM in 1976.  (Defs.'

Mot., Ex. A at 9, 15-16.)  As a Seventh Day Adventist, Plaintiff observes the

Sabbath (and therefore does not work) from sundown on Friday until sundown on

Saturday.  (*Id*. at 16, 104.)  Plaintiff has degenerative joint disease in his back,

which led to him being placed on permanent lifetime restrictions in the 1990's.

(*Id*. at 219-20.)   Those restrictions limit his ability to perform excessive standing,

pushing, bending, pulling, twisting, or lifting over twenty-five or thirty pounds.

(*Id*. at 30-31.)  Plaintiff also suffers from "anxiety rage attacks," where he has

difficulty breathing, his blood pressure rises dangerously high, he clenches his

hands into fists, and his heart races.  (*Id*. at 8, 72, 73, 78, 83.)  Plaintiff takes

Xanax, and sometimes Zoloft, to control these attacks.  (*Id*. at 140.)  He usually

---

[2] Throughout his brief in response to Defendants' summary judgment motion, Plaintiff cites to his Second Amended Complaint to support factual assertions. Plaintiff's pleading (like his initial Complaint and Amended Complaint) is neither verified, sworn to, nor made under the penalty of perjury.  Therefore, as indicated in Section I, the statements in the pleading do not constitute evidence.  Why Plaintiff's counsel cites to Plaintiff's pleading as evidence is baffling to the Court, however, as many (although not all) of the factual assertions set forth in his brief could have been supported with citations to Plaintiff's deposition testimony.

5

needs to get up and walk around in circles to control his emotions when he experiences an anxiety rage attack.  (*Id*. at 82.)

As a GM employee, Plaintiff was a member of the United Automobile Workers union ("UAW").  (*Id*. at 18.)  The UAW and GM are signatories to national and local collective bargaining agreements, which govern certain terms and conditions of Plaintiff's employment.  (*Id*. at 18-19.)  Pursuant to paragraph 76(A) of the national agreement, before a decision is made to issue discipline to a represented employee, the employee is entitled to a meeting where members of management, the employee, and a union representative discuss the situation.  (*Id*. at 76.)

In 2009, Plaintiff moved to GM's Willow Run parts warehouse, where he worked as a "walk picker."  (*Id*. at 17, 21.)  In that position, Plaintiff collected parts stored in the warehouse to fill GM orders.  (*Id*. at 21-22.)  Plaintiff worked the first shift at Willow Run, which began at six o'clock in the morning and ended usually at two o'clock in the afternoon.  (*Id*. at 22.)

In Fall 2013, Plaintiff's immediate supervisor at the Willow Run facility was Defendant Trent Miller ("Miller"), a Caucasian male.  (*Id*. at 23.)  Miller had supervised Plaintiff for five or six months by this time.  (*Id*. at 24.)  Miller reported to Defendant Greg Pepin ("Pepin"), a general supervisor or general foreman, who had worked at the Willow Run facility since Plaintiff arrived there and who also

previously acted as Plaintiff's direct supervisor. (*Id*. at 24-26.) Pepin also is a Caucasian male. (*Id*. at 24.)

On September 19, 2013, Pepin spoke to Plaintiff about being late for and talking during a "quality wall" meeting. (*Id*. at 45-47.) While the discussion between Plaintiff and Pepin became heated, Plaintiff was not disciplined on this occasion. (*Id*. at 48-49, 53.) Plaintiff admits to arriving a few minutes late to the meeting, claiming he was working. (*Id*.) He denies talking during the meeting, however. (*Id*.)

About a month later, on October 21, 2013, Defendant Todd Aicher, a Caucasian supervisor, told Plaintiff he would be supervising Plaintiff's group for the day in Miller's absence. (*Id*. at 26-27, 69.) According to Plaintiff, Leroy Haskins, the UAW local chairman, approached Plaintiff at around nine o'clock in the morning and said that Haskins heard Pepin say he was "going to show Clay [Plaintiff] who runs the show. I am not taking him off of notice." (*Id*. at 41, 70.) Later in the shift, Aicher approached Plaintiff and told him he was putting Plaintiff "on notice" for being late to a "huddle up" meeting that morning. (*Id*. at 70.) Plaintiff told Aicher he was late to the meeting because he was taking pain medication, but that he heard everything that was said. (*Id*. at 70-71.)

In "GM terms," putting an employee "on notice" means the employee is notified he might be subject to discipline. (*Id*. at 75.) The decision whether or not

7

to discipline the employee is made after the 76A meeting. (*Id*. at 75-76.) After the 76A meeting, Plaintiff received a written reprimand for arriving late to the huddle up meeting, which did not result in any lost compensation or time. (*Id*. at 87-89; Defs.' Mot., Ex. A at Pg ID 264.) According to Plaintiff, two Caucasian co-workers arrived to the huddle up meeting after him, but they did not receive written reprimands. (Defs.' Mot., Ex. A at 89; 192, 195.) Plaintiff acknowledged, however, that a Caucasian co-worker, Bob Duquette, was issued a written reprimand by the same management team for being late to a meeting during the same time frame. (*Id*. at 94.)

On November 4, 2013, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission and Michigan Department of Civil Rights (collectively "EEOC") alleging that the October 21 reprimand constituted race discrimination. (*Id*. at 91-92; Pl.'s Resp., Ex. E at Pg ID 698.) Plaintiff also alleged that GM's "Caucasian representative is very rude and disrespectful towards [Plaintiff] and other African American employees." (Pl.'s Resp., Ex. E.) Plaintiff does not identify any GM employee by name in the Charge. (*Id*.)

Plaintiff did not deliver the Charge to anyone at GM and he testified during his deposition that he does not know what the agencies do with Charges after they are filed. (Defs.' Mot., Ex. A at 103.) Plaintiff further testified that no one in

8

management at GM ever made any reference to him about his EEOC complaint. (*Id*. at 172-74.)  Plaintiff testified, however, that Leroy Haskins told him that Pepin discussed Plaintiff's Charge with Haskins.  (*Id*. at 172.)  But Plaintiff did not say when the conversation between Haskins and Pepin purportedly occurred and does not present any evidence of this fact.[3]  (*Id*.)  Plaintiff further testified that Delinquency Little, a GM supervisor until she retired in 2015, told Plaintiff that management talked about the Charge at a meeting.  (*Id*. at 173-74.)  Again, Plaintiff did not say when this meeting occurred and he offers no evidence to establish its timing.  The Charge reflects that it was sent to GM in care of Jackson Lewis LLP in Southfield, Michigan.  (Pl.'s Resp., Ex. E at Pg ID 698.)

At his deposition in this matter, Miller testified that he was not familiar with Plaintiff's EEOC complaints and had never answered or met with anyone from GM's legal or human resources departments to address an EEOC complaint. (Defs.' Mot., Ex. B at 99.)  When shown Plaintiff's Charge at his deposition, Pepin testified that he had never seen it before.  (*Id*., Ex. C at 84.)  Defendant David Neil, a general supervisor at the Willow Run facility, testified that he had never been approached by anyone at GM to respond to or help provide an answer to an EEOC complaint.  (*Id*., Ex. D at 37.)  Gene Lauer, the plant manager at Willow Run,

---

[3] Later in his deposition, Plaintiff testified that Haskins reported that Pepin said he "got both charges," suggesting that the conversation between Haskins and Pepin occurred after Plaintiff filed a later Charge.  (Defs.' Mot., Ex. A at 176.)

testified at his deposition that he has no dealings with respect to EEOC complaints. (*Id.*, Ex. E at 57.)

At some point, Lauer designated Saturday, December 7, 2013, as a mandatory workday for Willow Run employees. Plaintiff approached Neil prior to that date, and told Neil he is a Seventh Day Adventist and therefore does not work on Saturdays. (Defs.' Mot., Ex. A at 117.) According to Plaintiff, Neil responded: "All I know is you're supposed to be here. I don't care what day you go to church on." (*Id.*) Neil testified during his deposition that when Plaintiff told him he was a Seventh Day Adventist and therefore did not work on Saturdays, Neil told Plaintiff he needed to talk to his supervisor. (Defs.' Mot., Ex. D at 30.) Neil was not and has never been Plaintiff's supervisor, and does not have direct supervision over Plaintiff's supervisors. (*Id.* at 29-30.)

Plaintiff did not discuss the issue with any of his supervisors, but he did not report to work for the mandatory Saturday on December 7, 2013. Miller, Pepin, and Lauer testified that they were unaware of Plaintiff's religion prior to December 10, 2013.[4] (Defs.' Mot., Ex. B at 32-33; Ex. C at 29-31, 38; Ex. D at 57.) Plaintiff

---

[4] Citing Neil's deposition testimony, Plaintiff claims management discussed his religion and need for an accommodation during a group meeting. (Pl.'s Resp. Br. at Pg ID 665.) While Neil testified that Plaintiff's need for a religious accommodation was mentioned at a management meeting, he could not remember exactly when the meeting occurred, but thought it was before Plaintiff's suspension. (Defs.' Mot., Ex. E at 32-34.) As described *infra*, Plaintiff was suspended on December 12, 2013.

admitted during his deposition that he never discussed his religion or need to miss work with Miller, Pepin, Aicher, or Lauer.  (*Id*., Ex. A at 116-18.)  He claims, however, that it was "common knowledge" and "everybody knew" he was a Seventh Day Adventist and therefore did not work Saturdays.  (*Id*. at 233-34.)

According to Plaintiff, he had never worked a Saturday during the time Pepin supervised him even though-- he claims-- there were mandatory Saturdays during that period.  (*Id*. at 230-31.)  Miller and Lauer testified, however, that December 7 was the first mandatory Saturday in 2013.  (Defs.' Mot., Ex. B at 80-81; Ex. D at 44-45, 46.)  Pepin similarly testified that from mid-2011 through 2013, this was the first mandatory Saturday he recalled. (*Id*. Ex. C at 9, 32.)

When Plaintiff reported to work on December 10, 2013, Miller placed him on notice for missing the Saturday overtime.  (*Id*., Ex. A at 126.)  Plaintiff told Miller at that time that he is a Seventh Day Adventist.  (*Id*.)  According to Plaintiff, Miller was "shocked" and appeared to have not known.  (*Id*. at 126-28.)  Upset about being put on notice, Plaintiff went to the plant medical department and then took the next day off from work.[5]  (*Id*. at 135.)

---

[5] Plaintiff testified that when he gets upset or experiences one of his rage attacks, he often goes straight to "medical."  (Defs.' Mot., Ex. A at 49, 73.)  While employees at Willow Run generally are required to get a pass from their supervisor before going to medical, Plaintiff claims a nurse at the medical department told him not to wait for a pass and to come straight there.  (*Id*. at 73-74.)

When Plaintiff returned to work on Thursday, December 12, Miller approached Plaintiff and told him they were going to have his 76A meeting about his Saturday absence. (*Id*. at 136.) There is a factual dispute with respect to what Plaintiff said in response. Plaintiff testified that he said, "I can't believe you guys are going through with this," "I'm tired of playing games with you all," and "If you pursue this, I'm going to take other measure[s]." (*Id*. at 136-37.) Plaintiff claims he and Miller were laughing and joking (*id*. at 139); however, he also testified that he was worked up during their interaction: his heart was racing and he was engaging in some of the behaviors (e.g., clenching his fists) which he exhibits when he experiences an anxiety rage attack. (*Id*. at 140-42.) Plaintiff needed to take his medication to calm down. (*Id*. at 144.)

According to Miller, Plaintiff "started going crazy" when told about the 76A meeting and said something to the effect of "Whoever goes into that room, I can't promise who's going to come out." (Defs.' Mot., Ex. B at 109, 111.) Miller interpreted Plaintiff's statement to be a threat and reported it to his supervisor, Pepin. (*Id*. at 109-110.)

Plaintiff's union representative, Roger Pelton, then came to Plaintiff and told Plaintiff that Pepin wants him to go home and take some time off. (Defs.' Mot., Ex. A. at 147.) As Pelton was walking Plaintiff out of the building, Pepin told Plaintiff he was being suspended indefinitely and demanded Plaintiff's badge. (*Id*.

at 150.)  Plaintiff claims Pepin said "Get out of my building.  I'm sick of you.
Give me your doggone badge."  (*Id*. at 151.)  Plaintiff then left the facility.

The next day, December 13, 2013, Plaintiff filed for a medical leave of
absence.  (*Id*. at 162.)  He has remained on leave since that time, and has not
returned to active employment.  (*Id*. 162-63.)

On December 17, 2013, Plaintiff filed a second Charge of discrimination
with the EEOC, alleging discrimination based on race and religion and retaliation.
(Pl.'s Resp., Ex. E at Pg ID 701.)  In this second Charge, Plaintiff asserts that GM
failed to accommodate him based on his religion when he was told he would be
disciplined for failing to work the mandatory Saturday on December 7.  (*Id*.)  He
reports that he was then suspended indefinitely because of his race and religion and
in retaliation for his previous EEOC complaint.  (*Id*.)

After the EEOC sent Plaintiff a Dismissal and Notice of Rights form with
respect to his second Charge, Plaintiff sent a letter to the Michigan Department of
Civil Rights, dated August 20, 2014, claiming bias on the part of its investigator
and requesting reconsideration of the decision.  (*Id*.)  In this letter, Plaintiff states:
"It is hard to believe that there was not a finding of breach of contract, retaliation,
and wrongful suspension."  (*Id*. at 1.)  In the next paragraph, Plaintiff states: "It is
also hard to believe that multiple complaints involving breach of contract,
wrongful discharge, religious violations, Americans with Disability Act, and racial

13

discrimination[] issues could be dismissed with a single sentence when the aforementioned, by their very nature[,] require explication." (*Id*. at 1-2.) The EEOC sent Plaintiff another Dismissal and Notice of Rights form, signed and dated August 25, 2014, indicating it was closing its file on the Charge and had adopted the state agency's findings. (Pl.'s Resp., Ex. E.)

In the meantime, on December 20, 2013, GM contacted Plaintiff about returning to work. (Defs.' Mot., Ex. A at 207-08.) GM also sent a letter to Plaintiff, dated January 6, 2014, notifying him of his need to return to work. (Defs.' Mot., Ex. F.) GM indicates in the letter, "Upon your return, you will be placed in the Par 76(a) interview for the shop rule violation that caused your suspension" and that the interview had been scheduled for Wednesday, January 8, 2014, at 10:00 a.m. (*Id*.) Plaintiff's treating physician recommended that Plaintiff not return to work, due to "the negative physical and psychological traumas caused by a hostile work environment and an unexplained dismissal." (Pl.'s Resp., Ex. I.) Plaintiff did not return to work.

Plaintiff contends Pepin orchestrated the various disciplinary actions against him and that Aicher and Miller were acting at Pepin's direction. (Defs.' Mot., Ex. A at 92, 159, 161.) Plaintiff never heard Pepin make any racially offensive or disparaging remarks. (Defs.' Mot., Ex. A at 97.) Plaintiff believes, however, that Pepin "just had a thing for me. Some supervisors just don't like you." (*Id*. at 262.)

14

Plaintiff also never heard, directly or indirectly, Aicher, Miller, Neil, or Lauer make any racially discriminatory or disparaging statements.  (*Id*. at 99-101.) According to Plaintiff, he and Miller got along well prior to their December 12, 2013 confrontation.  (*Id*. at 138, 160.)

## III.   Applicable Law and Analysis

### A.   Race or Religious Discrimination

Plaintiff claims Defendants discriminated against him based on his race and/or religion, in violation of Title VII and ELCRA, when they issued the October 2013 verbal reprimand for coming late to a huddle up meeting, put him on notice in December 2013 for not reporting on a mandatory Saturday, and suspended him in December 2013 for making a threat.

As an initial matter, Defendants note that Plaintiff's Title VII claims fail against the individual defendants because "Title VII does not create individual liability for individuals in supervisory positions such as [Lauer, Pepin, Neil, Aicher, and Miller]."  *Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003) (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400 (6th Cir. 1997)).  Plaintiff does not respond to this argument.  Based on the Sixth Circuit precedent Defendants cite, this Court agrees that the individual defendants are entitled to summary judgment with respect to Plaintiff's Title VII discrimination claims.

15

An employee may establish a claim of discrimination under Title VII and ELCRA by offering either direct or circumstantial evidence of discrimination. *White v. Columbus Metro. Hous. Auth.*, 424 F.3d 232, 238 (6th Cir. 2005) (Title VII); *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192 (Mich. 2003) (ELCRA).  Plaintiff does not present direct evidence to show that Defendants discriminated against him because of his race or religion.

When a plaintiff proves his case through circumstantial evidence, he begins by establishing a prima facie case of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  To make this showing, the plaintiff must establish the following: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted).  If the plaintiff sets forth a prima facie case, an inference or rebuttable presumption of discrimination arises.  *DiCarlo*, 358 F.3d at 414.

In order to rebut this inference, the employer must "articulate some legitimate, non-discriminatory reason" for its conduct.  *Id*. If the employer articulates such a reason, " 'the plaintiff must then have an opportunity to prove by

16

a preponderance of the evidence that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination.' " *Id.* at

414-15 (quoting *Burdine*, 450 U.S. at 253).

Defendants argue that Plaintiff cannot establish a prima facie case of

discrimination with respect to the October 2013 reprimand or December 2013

potential discipline because neither constituted an adverse action.  The Sixth

Circuit has provided the following guidance for identifying "an adverse

employment action":

> [A] materially adverse change in the terms and
> conditions of employment must be more disruptive than a
> mere inconvenience or an alteration of job
> responsibilities. A materially adverse change might be
> indicated by a termination of employment, a demotion
> evidenced by a decrease in wage or salary, a less
> distinguished title, a material loss of benefits,
> significantly diminished material responsibilities, or
> other indices that might be unique to a particular
> situation.

*Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v.*

*Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993)).  The

Sixth Circuit has held that "[a] written reprimand, without evidence that it led to a

materially adverse consequence such as lowered pay, demotion, suspension, or the

like, is not a materially adverse employment action."  *Cregget v. Jefferson Cty. Bd.*

*of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) (citing cases); *see also Taylor v.*

*Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (finding that two written reprimands

17

did not amount to an adverse employment action because there was "no evidence
in the record that any disciplinary action resulted from [the two reprimands], or
that [the two reprimands] related to a larger pattern of intimidation by constantly
reprimanding [the employee], for example.").

At his deposition, Plaintiff testified that he did not incur a loss in pay
because of the October 2013 reprimand (*see* Defs.' Mot., Ex. A at 88), and he
admitted that he never attended a 76A meeting to determine whether he would be
disciplined for failing to report on the mandatory Saturday.[6]  In response to
Defendants' motion, Plaintiff does not identify any material adverse consequence
resulting from *these* incidents.[7]  He, therefore, cannot establish a prima facie case
of discrimination based on the October 2013 reprimand or December 2013
potential discipline.[8]  Moreover, with respect to those actions as well as his

_____

[6] Plaintiff in fact testified that he did not think GM would impose any discipline for
the Saturday absence because it would have been excused based on his religion.
(Defs.' Mot., Ex. A at 149.)  He further testified that if any discipline had been
imposed, it would have been simply a written reprimand or warning.  (*Id.* at 150.)

[7] Attempting to distinguish one of the cases Defendants cite to with respect to their
"adverse action" argument, *Amthor v. City of Macomb* No. 13-14100, 2015 WL
1780637 (E.D. Mich. Apr. 20, 2015), Plaintiff argues that he "was immediately
indefinitely suspended; thrown out of the plant; badge taken; lied on; personnel file
fraudulently papered to give management the appearance of a 'legitimate business'
excuse to suspend indefinitely or terminat[e] him."  (Pl.'s Resp. Br. at Pg ID 672.)
The actions Plaintiff refers to-- and which there is evidence to support-- were taken
in relation to his December 2013 indefinite suspension, however.

[8] Defendants alternatively argue that Plaintiff cannot state a prima facie case of
discrimination based on his October 2013 written reprimand because he admits that
the same supervisory staff disciplined a similarly situated Caucasian employee for

December 12, 2013 suspension, Defendants argue that Plaintiff's claim of religious discrimination fails because there is no evidence that the involved decision makers were aware that Plaintiff was a Seventh Day Adventist.

To establish a prima facie case of discrimination where an employee's personal attributes are not obvious to the employer (for example, the employee's religious beliefs or pregnancy before the employee is visibly pregnant), the employee must prove the employer was aware of the plaintiff's particular personal attributes. *See Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 581-82 (3d Cir. 1996); *see also Prebilich-Holland v. Gaylord Entmt. Co.*, 297 F.3d 438 (6th Cir. 2002) (following Circuits holding that "a pregnancy discrimination claim cannot succeed in the absence of the employer's knowledge of the pregnancy" and citing Sixth Circuit decisions requiring evidence of the employer's knowledge of a plaintiff's disability to establish a prima facie case of disability discrimination); *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) (holding that the plaintiff failed to establish a prima facie case of religious discrimination where he failed to "present any evidence that the decision-maker knew of his religion[.]"). "[I]t is counter-intuitive to infer that the employer discriminated on

the same misconduct.  Further, Defendants argue that Plaintiff fails to identify a Caucasian employee or an employee of a different religion who failed to report for a mandatory Saturday who was treated differently than Plaintiff.  Larue Mason, an African American co-worker also failed to report for work on the December 7 mandatory Saturday.  (Defs.' Mot., Ex. A at 129.)  Plaintiff acknowledged that Miller initially placed Mason on notice for missing work that day.  (*Id.*)

19

the basis of a condition of which it was wholly ignorant."  *Geraci*, 82 F.3d at 58.

As the Sixth Circuit set forth in *Virts v. Consolidated Freightways Corp. of*

*Delaware*, 285 F.3d 508 (2002), to establish a prima face case of religious

discrimination, the plaintiff must show that "he holds a sincere religious belief that

conflicts with an employment requirement . . . and he has informed the employer

about the conflicts[.]"  *Id.* at 515.

Here, Plaintiff never provided documentation to GM identifying his religion

or need for an accommodation because of his religious beliefs, and he agreed

during his deposition that his personnel file does not contain such documentation.

(Defs.' Mot., Ex. A at 109-110, 112-13.)  The evidence reflects that before Plaintiff

failed to report to work on the mandatory Saturday on December 7, 2013, he never

discussed his religion or inability to work on Saturdays because of his religion with

Miller, Pepin, Aicher, or Lauer.  While Plaintiff may have discussed his religion

and resulting inability to work Saturdays with Neil, Neil was not Plaintiff's

supervisor and was not involved in any decision to discipline Plaintiff for failing to

work on December 7.  Moreover, the evidence does not reflect that Neil informed

other supervisors of Plaintiff's religion or need for religious accommodation *before*

Plaintiff was put on notice for failing to work on that date.  Finally, Plaintiff cannot

prove the decision makers' knowledge of his religion or need for a religious

accommodation based on his claim that both were "common knowledge" at

20

Willow Run.  *See Geraci*, 82 F.3d at 582 (holding that the plaintiff's claim that she told some co-workers she was pregnant and that her pregnancy became a "common topic of discussion in the office" was insufficient to show that her managers knew she was pregnant when they terminated her); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (stating that a plaintiff's speculation about his employer's knowledge of his condition does not create a genuine issue of material fact; "instead, it creates a false issue, the demolition of which is a primary goal of summary judgment"); *see also Nelski v. Trans Union, LLC*, 86 F. App'x 840, 846 (6th Cir. 2004) ("Unsubstantiated speculation is not enough to create a genuine issue of material fact on which a jury could reasonably find for [the plaintiff].").  The Court therefore holds that Defendant is entitled to summary judgment with respect to Plaintiff's claims alleging religious discrimination.  This leaves Plaintiff's race discrimination claims based on his December 12 suspension.

Defendants do not dispute that Plaintiff's suspension is an adverse action and they concede, for purposes of their motion, that Plaintiff can establish a prima facie case of discrimination based on this action.  (Defs.' Br. in Supp. of Mot. at Pg ID 175.)  Defendants contend, however, that Plaintiff cannot demonstrate that their non-discriminatory reason for suspending him-- that is, that he made a statement management interpreted to be a threat of violence-- was a pretext for discrimination.

21

A plaintiff can show pretext by demonstrating that the defendant's stated reason for the adverse employment action (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the action. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The plaintiff "must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it [took the adverse action against the plaintiff]." *Id*. (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)). " '[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation].' " *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4). Plaintiff argues that Defendants' proffered non-discriminatory reason for suspending him has no basis in fact.

Miller testified that he interpreted Plaintiff's statement to be a threat and that he reported this to Pepin and other facility managers. (Defs.' Mot., Ex. B at 109-110.) Plaintiff denies making any threatening statements to Miller. However, even if a jury believes Plaintiff, there is no evidence to suggest that the other supervisors (particularly Pepin, who seems to have made the subsequent decision to suspend Plaintiff) did not honestly believe Miller.[9] Moreover, there is no evidence suggesting that Defendants made up this reason to conceal intentional race or

---

[9] As mentioned previously, Plaintiff contends Miller was acting at Pepin's directive. He offers absolutely no evidence to support this claim, however.

22

religious discrimination.[10]  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515

(1993) (stating "a reason cannot be proved to be 'a pretext for discrimination'

unless it is shown both that the reason was false, and that discrimination was the

real reason").

Plaintiff offers no evidence of racial or religious animus on the part of any of

his supervisors.  At most, Plaintiff presents evidence suggesting Pepin did not like

him.  Plaintiff does not offer any evidence, however, suggesting that race or

religious bias motivated Pepin's feelings toward him.  As Plaintiff himself

testified, "Some supervisors just don't like you."  (Defs.' Mot., Ex. A at 262.)

Absent proof that Plaintiff's race engendered this personal animosity, he fails to

present evidence of unlawful discrimination.  *See Barnett v. Dep't of Veteran

Affairs*, 153 F.3d 338, 343(6th Cir. 1998) (upholding the district court's

determination that witness's statements describing how supervisor made it known

that "he disliked the plaintiff and used her as the butt of office jokes, are consistent

with personal dislike rather than discriminatory animus"); *Nizami v. Pfizer Inc.*,

107 F. Supp. 2d 791, 805 n. 15 (E.D. Mich. 2000) (Plainly … even such a

subjective consideration as personal dislike can be a 'proper'-- that is, not

---

[10] Throughout his response brief, Plaintiff claims Defendants fabricated his "661 personnel report" (which is attached as Exhibit D to Plaintiff's motion) and contends that this fabrication proves their discriminatory and retaliatory animus. Plaintiff fails to support his claim of fabrication with any evidence.  In any event, there is no evidence from which a reasonable juror could conclude that any fabrication was motivated by unlawful bias.

23

unlawful-- basis for avoiding liability under antidiscrimination law, as long as this personal animus is not the product of the plaintiff's membership in a protected class.").

For these reasons, the Court holds that Defendants are entitled to summary judgment with respect to Plaintiff's claims alleging race and religious discrimination (Counts I, II, IV-VI).

## B.    Retaliation

Plaintiff claims Defendants violated Title VII and ELCRA by retaliating against him for engaging in protected conduct when they placed him on notice for missing the mandatory Saturday and suspended him indefinitely based on the perceived threat to Miller.

Absent direct evidence of a retaliatory purpose, the same burden-shifting framework applicable to Plaintiff's discrimination claims governs his Title VII and ELCRA retaliation claims. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (Title VII); *Meyer v. City of Ctr. Line*, 619 N.W.2d 182, 188 (Mich. Ct. App. 2000) (ELCRA).  First, Plaintiff must establish a prima facie case of retaliation by showing: (1) he engaged in activity protected by Title VII [or ELCRA]; (2) Defendants knew about Plaintiff's exercise of this right; (3) Defendant took an employment action adverse to Plaintiff; and (4) the protected activity and the adverse employment action are causally connected.  *Gribcheck v.*

24

*Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Title VII); *Garg v. Macomb Cnty.*

*Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005) (listing same

elements in ELCRA retaliation analysis).  Under Title VII, Plaintiff must show that

his protected activity "was a but-for cause of the alleged adverse action by

[Defendants]."  *Univ. of Tex. SW Med. Ctr. v. Nassar*, -- U.S. --, --, 133 S. Ct.

2517, 2534 (2013).  Under ELCRA, Plaintiff's protected activity must be a

"significant factor" in Defendants' adverse employment action.  *Barrett v. Kirtland*

*Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

If Plaintiff satisfies this burden, Defendants must come forward with a

legitimate, non-retaliatory reason for the employment action.  *Ladd*, 552 F.3d at

502.  In response, Plaintiff must show that Defendants' reason was a pretext for

retaliation.  *Id.*

As discussed with respect to his discrimination claim, Plaintiff did not suffer

an adverse action based on his failure to report for work on the mandatory

Saturday.  Thus, he cannot make out a prima facie case of retaliation based on that

incident.  With respect to Plaintiff's suspension, Defendants contend that he cannot

establish a prima facie case of retaliation because there is no evidence that the

relevant decision makers were aware of Plaintiff's protected conduct.  This Court

agrees.

As an initial matter, Plaintiff asserts in his response brief that he engaged in protected activity of which Defendants were aware, other than the filing of his EEOC complaints. (*See* Pl.'s Resp. Br. at Pg ID 677-78.) Specifically, Plaintiff refers the Court to Exhibits C, F, G, and H to his brief. Exhibit C is a June 1, 2012 letter Plaintiff wrote to Cathy Clegg, GM's Vice President of Labor Relations, in which Plaintiff claims that four individuals-- notably, no one named in the current lawsuit-- failed to accommodate Plaintiff's work restrictions related to a back injury and were placing workers at risk by "creat[ing] a dangerous/hazardous work environment."[11] (*Id.*, Ex. C at 3.) Plaintiff presents no evidence to suggest that the individuals who decided to suspend him a year and a half later were aware of this letter. Exhibit F is a letter Plaintiff wrote to Clegg and Joe Ashton, the UAW's Vice President, dated December 13, 2013-- *after* his suspension. Similarly, Exhibit H is the grievance the UAW filed *in response to* Plaintiff's suspension. Clearly, protected activity taken after the adverse action cannot be "a but-for cause of" or "significant factor in" the adverse action. Finally, Exhibit G is GM's record of the notices given to Plaintiff and thus this exhibit in no way reflects protected activity *by* Plaintiff. This leaves Plaintiff's November 4, 2013 EEOC Charge.

Plaintiff did not personally deliver the Charge to Defendants. At their depositions, Miller and Pepin indicated that they were unaware of the Charge prior

---

[11] The letter reflects that a copy was sent to Joe Ashton, the UAW's Vice President. (Pl.'s Resp., Ex. C at 3.)

26

to this litigation.  Plaintiff fails to identify any evidence in response to Defendants'
summary judgment motion to show that they-- or any other supervisor at Willow
Run-- were aware of the Charge before Plaintiff's suspension.  Plaintiff does not
present evidence reflecting when the management meeting occurred where
Delinquency Little purportedly told Plaintiff his Charge was discussed.  Plaintiff's
assertion that the relevant decision makers had to have been made aware of the
Charge in order for GM to respond is based on pure speculation.  The response,
prepared by outside counsel for GM, in no way reflects that Miller, Pepin, or any
other supervisor at Willow Run was consulted to prepare the document.  In short,
Plaintiff fails to show that the individuals who decided to suspend him were aware
of his EEOC Charge.

Therefore, the Court finds that Plaintiff fails to create a genuine issue of
material fact with respect to whether the individuals who made the decision to
suspend him were aware of his protected activity.  He therefore fails to
demonstrate a prima facie case of retaliation under Title VII or ELCRA (Counts III
and VII).

### C.    Hostile Work Environment/Constructive Discharge

Plaintiff claims Defendants subjected him to a hostile work environment
based on his race, which led to his constructive discharge in violation of Title VII
and ELCRA.

27

Discrimination so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment" violates Title VII and ELCRA. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012). To demonstrate a hostile work environment claim under either statute, the plaintiff must establish: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) there exists some basis for liability on the part of the employer. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011); *see also Haynie v. Michigan Dep't of Police*, 664 N.W.2d 129, 133 (Mich. 2003). Where the plaintiff alleges constructive discharge, he must additionally show "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004). Defendants maintain that Plaintiff's hostile work environment-constructive discharge claim fails because he does not demonstrate that his work environment was permeated with severe or pervasive discriminatory harassment or that any harassment was based on his race.

Courts deciding whether the complained of conduct was sufficiently severe or pervasive to create a hostile work environment look at " 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Williams*, 643 F.3d at 512.  " '[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (additional quotation marks omitted). "Occasional offensive utterances do not rise to the level required to create a hostile work environment." *Id*. at 512-513.  Plaintiff fails to demonstrate conduct by Defendants that a reasonable jury could find to be "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment."  Moreover, for the reasons discussed earlier, Plaintiff fails to show that any harassment was based on his race.

Therefore, Defendants are entitled to summary judgment on Plaintiff's hostile work environment-constructive discharge claims (Counts VIII and IX).

**D.      Failure to Accommodate**

Plaintiff alleges Defendants violated the ADA by failing to accommodate his physical impairments.  Defendants contend this claim is subject to dismissal because Plaintiff failed to exhaust his administrative remedies.

"Under the ADA, a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination."  *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000) (citing 42 U.S.C. §§ 12117(a), 2000e-5(e)(1) and *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000)).  A claimant may not file a lawsuit alleging an ADA violation unless he or she has received a right-to-sue letter from the EEOC because, until then, the claimant has not exhausted his or her remedies.  *Id*. (citing 42 U.S.C. §§ 2000e-5(f)(1), 12117(a)).  Filing a charge of discrimination with the EEOC is a condition precedent to filing suit under the ADA.  *Id*.  However, this condition precedent is not jurisdictional and may be waived by the parties or the Court, such as where the plaintiff receives a right-to-sue letter after filing his or her complaint and while the lawsuit remains pending.  *Id*. (citing *Portis v. Ohio*, 141 F.3d 632, 635 (6th Cir. 1998)); *see also Chandler v. Vulcan Materials Co.*, 81 F. App'x 538, 541 (6th Cir. 2003) (waiving the exhaustion requirement where the plaintiff timely filed a charge

of discrimination with the EEOC after filing suit and there was no prejudice to the

defendants).

The Sixth Circuit has held that to constitute a "charge" necessary to exhaust

an employee's administrative remedies, the document submitted to the EEOC must

satisfy three requirements:

> [T]he filing (1) must be "verified"-- that is, submitted
> under oath or penalty of perjury, 29 C.F.R. § 1601; (2)
> must contain information that is "sufficiently precise to
> identify the parties, and to describe generally the action
> or practices complained of," *id*. § 1601.12(b); and (3)
> must comply with [*Federal Express Corporation v.*]
> *Holowecki*-- that is, an "objective observer" must believe
> that the filing "taken as a whole" suggests that the
> employee "requests the agency to activate its machinery
> and remedial processes," 552 U.S. 389, 398, 402 [2008].

*Williams*, 643 F.3d at 509.  As the Sixth Circuit has explained, the requirement that

a charge be "sufficiently precise to identify the parties, and to describe generally

the action or practices complained of" serves two purposes:

> First, the requirement provides the basis for the EEOC's
> "attempt to obtain voluntary compliance with the law."
> Second, these attempts "notify potential defendants of the
> nature of the plaintiff's claims and provide them the
> opportunity to settle the claims before the EEOC rather
> than litigate them."

*Sumser Ret. Vill.*, 209 F.3d at 853 (quoting *Abeita v. TransAmerica Mailings, Inc.*,

159 F.3d 236, 254 (6th Cir. 1998)).  To satisfy this requirement, the "complainant

need not 'attach the correct legal conclusion' to allegations in the charge, 'conform

31

to legal technicalities,' or use 'the exact wording which might be required in a judicial pleading.' " *Id*. (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)).  Nevertheless, a plaintiff is not "excused from filing charges on a particular discrimination claim before suing in federal court." *Id*.  "The claim must grow out of the investigation or the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt an investigation of the claim." *Id*.

Plaintiff does not mention a disability, disability discrimination, or the failure to accommodate a disability in either of the complaints he filed with the EEOC.  (*See* Pl.'s Resp., Ex. E at Pg ID 698, 701.)  Plaintiff nevertheless contends that he exhausted his ADA claim because he stated in his second EEOC Charge that he was suspended on December 12, 2013, "after taking a day off due to medical reasons" (*see id*. at Pg ID 701), and mentioned the ADA in his request for reconsideration.[12]  Plaintiff's statement that he was away from work for "medical reasons" (which could mean many things besides a disability) and reference to the ADA, without more, would not prompt (and did not prompt) the EEOC to investigate a claim for disability discrimination or failure to accommodate a disability.

---

[12] In his response brief, Plaintiff also states that his second Charge lists the medications he takes, which he believes would reflect that he suffers from a disability.  (*See* Pl.'s Resp. Br. at Pg ID 682.)  No medications are listed in either Plaintiff's first or second EEOC complaints, however.  (*See* Pl.'s Resp., Ex. E at Pg ID 698, 701.)

32

The Court therefore holds that Plaintiff failed to exhaust his administrative remedies with respect to his ADA claim. Defendants clearly are not waiving this precondition to filing suit, and there are no circumstances in this case to justify the Court's waiver of the requirement. Defendants, therefore, are entitled to summary judgment with respect to Plaintiff's ADA claim (Count X).

### E. Intentional Infliction of Emotional Distress

Plaintiff alleges that Defendants' actions and conduct were extreme and outrageous and caused him severe emotional distress.

Under Michigan law, a "complainant must produce evidence of extreme and outrageous conduct, of the actor's injurious intent or reckless disregard for the consequences of his acts, of causation, and of the actual experience of severe distress before his case will be submitted to a jury." *Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980) (additional quotation marks omitted). To qualify as extreme and outrageous behavior, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908-09 (Mich. 1985). Plaintiff fails to show (or even allege) conduct that meets this threshold.

The Court therefore is granting summary judgment to Defendants on Plaintiff's intentional infliction of emotional distress claim (Count XI).

33

## IV.    Conclusion

For the reasons set forth above, the Court finds that Plaintiff fails to present evidence to sustain his burdens of proof with respect to his claims alleging race or religious discrimination, retaliation, hostile work environment-constructive discharge, or intentional infliction of emotional distress.  Plaintiff failed to exhaust his administrative remedies with respect to his ADA claim.

Accordingly,

**IT IS ORDERED**, that Defendants' Motion for Summary Judgment (ECF No. 27) is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 14, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, September 14, 2016, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager
